**WESTERN ADDITION COMMUNITY ORGANIZATION et al.,**
**Plaintiffs,**

v.

**Frank N. ALIOTO et al., Defendants.**

**No. 70 1335   WTS.**

United States District Court,
N. D. California.

Nov. 19, 1973.

78

Robert L. Gnaizda, Public Advocates, Inc., Mario G. Obledo, Mexican-American Legal Defense & Educational Fund, San Francisco, Cal., for plaintiffs.

Thos. M. O'Connor, City Atty., Michael C. Killelea, Deputy City Atty., Davis, Cowell & Bowe, San Francisco, Cal., for Fire Fighters' Union.

William J. Murphy, San Francisco, Cal., for Robert Cutone and others.

Peter Adomeit, Brundage, Neyhart, Grodin & Beeson, San Francisco, Cal., for intervenors Edw. Tartarian & Civil Service Assn. of San Francisco.

## MEMORANDUM OF DECISION

SWEIGERT, District Judge.

This case, involving San Francisco Civil Service tests for selection of Fireman H–2, is again before the court on plaintiff's motion of June 19, 1973, requesting the court to implement its previous orders by granting immediate and further relief, specifically requesting that the court impose a racial quota formula, favoring appointment of minority applicants over non-minority Fireman H–2 applicants, until the racial composition of the Fire Department fairly re-

flects, percentage-wise, the racial composition of San Francisco's population.[1]

The law, however, does not require that employment, either private or public, must proportionately reflect the community racial population. On the contrary, the 1964 Civil Rights Act, Title 42 U.S.C. § 2000e–2(j), expressly provides that nothing in the Act shall be interpreted to require any employer to grant preferential treatment to any individual or group on a racial basis merely because of an imbalance between the percentage of his employees of that race in comparison with the percentage of persons of that race in the community population as a whole.

■ All that the law requires is that no minority job applicant (and for that matter no white job applicant), who is otherwise qualified or readily qualifiable to perform a job, shall in effect be excluded from that job by an employment test that goes beyond the actual requirements of the job and thus adversely affects applicants, generally minorities, who, although able to do the job, lack the background and education to pass an overdemanding test. When it appears, as in this case, that an employment test has operated adversely against certain racial groups, then the test becomes suspect as being overdemanding and, therefore, presumptively discriminatory and unlawful, and remains so unless and until the employer meets the burden of demonstrating that the particular test is, nevertheless, not overdemanding, but truly job-related and, therefore, a necessary test for the job's performance.

This the San Francisco Civil Service Commission has three times failed to do in this case, i. e., it has failed to demonstrate, as required by law, that its challenged Fireman H–2 written examinations have been truly job-related. See Decision of January 8, 1971 re the written test of 1968; the Decision of February 17, 1972 re the written test of September, 1971, and the Decision of May 9, 1973 re a proposed 1973 written test.

■ It has been held by the Court of Appeals of this Ninth Circuit (see United States v. Iron Workers Union, 443 F. 2d 544 (9th Cir. 1971)) and by many other federal courts (See e. g., Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971) and Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965)), that in such a situation the foregoing provision of the 1964 Civil Rights Act must not be used by Federal District Courts to avoid responsibility for granting affirmative remedies designed to eliminate any such present discriminatory practices, to assure the non-repetition thereof in the future and to remove the vestiges of past discriminatory practices; that such affirmative remedies may be granted even though it cannot be established that the discriminatory practices were intentional or invidious.

This court has thus far refrained from invoking affirmative remedies in this case, pointing out in our decision of May 9, 1973, that any discriminatory practices in this case were not shown to have been intentional or invidious and that such remedies (which should be invoked by the courts only as a last resort) seemed unnecessary at that time because of the court's expectation that rejection rates adverse to minority Fireman H–2 applicants would be cured within a reasonable time by simply enjoining use of the challenged written examination as a test until properly validated—meanwhile filling Fireman H–2 vacancies according to the applicants' scores on the other oral and athletic tests as the City had planned to do in any event.[2]

1. Plaintiffs point out, for example, that the 1800-man San Francisco Department includes only 4 men of the Negro race appointed through regular Civil Service Commission selection procedures although the City's racial composition, according to the 1970 census, is 43% minority (15% black–28% other minority) and will be in 1975, according to a census projection, 51% minority (so-called). The City's high schools are already 65% minority.

2. As indicated in previous Memoranda of Decisions of the court, the Commission uses

By its orders of February 7, 1972, February 17, 1972 and March 7, 1972, this court ordered that, pending submission of a written test properly validated as required by law, the Commission should proceed with all due diligence to give to the 1968 Fireman H–2 applicants their oral and athletic tests in order to provide a Fireman H–2 Civil Service list from which Fire Department vacancies would be filled until the City was able to bring any desired written test into compliance with the law.

Five months later, this court by its order of July 20, 1972, found that the Commission, even by that date, had already had a reasonable time within which to proceed with those oral and athletic tests and ordered it to proceed with them within 30 days from the date of that order.

Nearly a year later, this court by its order of May 9, 1973, after rejecting the Commission's proposed 1973 examination) again directed the Commission to do two things: (1) to proceed with reasonable diligence to empirically validate its Fireman H–2 selection procedures as considered necessary even by its own Director of Recruitment as far back as November 24, 1971, and (2) meanwhile, in order that there be no further interruption in filling San Francisco fireman manpower requirements, to fill the Fire Department's current and developing vacancies in the manner authorized and directed by this court as far back as February 1972.

To date the Civil Service Commission has failed to comply with either of these two requirements—notwithstanding the fact that the San Francisco Fire Department has meanwhile accumulated in excess of 200 vacancies with additional vacancies occurring every month. In other words, a vitally necessary City facility, which must operate on double shifts around the clock day and night, is now more than 11% undermanned.

Further, notwithstanding this court's previous orders of February and March, 1972, to proceed promptly with giving to the 1968 Fireman H–2 applicants their oral and athletic tests (lest fireman manpower requirements and the rights of applicants be adversely affected), the Commission failed to complete its athletic tests until August, 1973, and its oral tests until September, 1973.

The Commission's dilatoriness in these matters and apparent stubborn insistence upon arguments and alternatives which this court has repeatedly found unacceptable, have created an intolerable situation; the adequacy of Fire Department manpower for the safety of the City is coming into question; all Fireman H–2 applicants, both minority and non-minority, have been kept in a state of uncertainty for several years and the rights of minority applicants to a more prompt correction of the City's still unvalidated selection procedures are involved.

The Commission now has a pool of Fireman H–2 applicants who have taken and passed its tests as follows: The written examinations:[3] 126 minority and 394 non-minority applicants took and passed the written examination at a 50 out of 100 questions exclusion cut-off point and, under Civil Service proce-

its written test, not to rate applicants, but only as a pass-fail test to exclude applicants who fail to correctly answer an arbitrarily fixed percentage of the questions, from proceeding to take the oral and athletic tests upon which the surviving applicants will be actually rated and ranked on the Civil Service list.

3. This written examination was given on June 9, 1973, to 524 applicants (130 minority and 394 non-minority) under a provision of this court's previous order of May 9, 1973

allowing the giving of that proposed written test for certain limited purposes and subject to certain conditions stated at pp. 14–15 of that order—one of which conditions was that such written test might be tentatively approved *if* the exclusionary cut-off was fixed at a point that would assure no adverse effect upon minority applicants. The Commission has heretofore proposed a cut-off point of 65% but the court now finds that only if that cut-off point be modified to 50%, will avoidance of adverse effects on minority applicants be assured.

dures, became eligible to proceed to the oral and athletic tests.

The oral[4] and athletic examinations: 118 minority and 394 non-minority applicants took and passed the oral examination and the athletic examination and will be rated and ranked on the Fireman H–2 eligible list according to their scores.

All 512 applicants (118 minority and 394 non-minority) who have taken and passed these three examinations (and also certain background and medical tests) are now civil service qualified Fireman H–2 eligibles. There can no longer be any valid claim that appointment of any or all of them, minority or otherwise, will involve introduction of untested, unqualified minority applicants into the Fire Department.[5]

Upon the facts found and for the reasons indicated above the court concludes and makes its further order as follows:

(1) Until the further order of this court, the 512 Fireman H–2 applicants who have passed the written examination, the oral examination and the athletic examination as above set forth, shall constitute the Civil Service list from which the Commission shall proceed to forthwith fill existing Fireman H–2 vacancies—one (1) qualified minority applicant and one (1) qualified non-minority applicant alternatively from sublists of qualified minority and qualified non-minority applicants—until the sublist of qualified minority applicants has been exhausted.[6]

(2) Any excess of qualified non-minority applicants remaining at that

4. All through this litigation plaintiffs' challenge to the Commission's selection procedures has been directed at the written examination. Not until June 19, 1973, did plaintiff raise a question concerning the oral examination which was then being given under the court's order and was not complete until September. For this reason the issue of the validity of the oral examination has not been heard. However, reports on the results of the oral examination completed in September do not show any such adverse effect on minorities as would justify eliminating, at this point, that test for rating purposes.

5. In addition, the City has the right under its own ordinance to terminate any Fireman H–2 who, during the initial 8 week Fire College on-the-job training and testing period or during the one year probationary period, or at any other time allowed by law, is found to lack any job-related knowledge, skill or trait. Nothing in this order shall be deemed to impair that right.

6. Similar and even more far-reaching affirmative relief has been granted in 13 federal cases (5 involving fire department civil service and 8 involving police department civil service); three of these cases have been Court of Appeal cases (1st, 2d and 8th Circuits). See also, *Morrow* case, 5th Circuit, infra, and 10 have been District Court cases. No federal cases to the contrary have been called to our attention.

Carter v. Gallagher, 452 F.2d 315, 327 (8th Cir. 1971, cert. den. by U.S. Supreme Court, 405 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972), a Minneapolis Fire Department Civil

Service case in which an 8 to 1 Circuit (en banc) decision holds to the effect that, although absolute preference is improper, the District Court should impose some reasonable quota hiring system, e. g., a one to one ratio (p. 330 seq.) until a certain number of qualified minority persons have been hired; Castro v. Beecher, 459 F.2d 725, 736 (1st Cir. 1972), a Boston Police Department Civil Service case in which the court reverses 334 F.Supp. 930 (Wyzansky, J.) for failure to provide some form of affirmative quota relief; Bridgeport v. Civil Service Commission, 482 F.2d 1333, 1340 (2d Cir. 1973), a Bridgeport, Connecticut, Police Department Civil Service case in which the court unanimously affirms a hiring quota (one for one) until 50 minority patrolmen appointed, as had been required by the District Court in 354 F.Supp. 778 (D.Conn.1973); Morrow v. Crisler, 479 F. 2d 960 (5th Cir. 1973), a Highway Police Civil Service case in which a 2 to 1 majority decision is to the effect that the District Judge's failure to include affirmative quota relief was not necessarily an abuse of discretion; a dissenting judge held contra, citing among other cases United States v. Ironworkers, 443 F.2d 554 (9th Cir. 1971), cert. den., 404 U.S. 484, 92 S.Ct. 447, 30 L.Ed.2d 367. A majority of the active judges of the 5th Circuit voted in favor of a hearing en banc which was held October 17, 1973, but no final decision as of 2/6/73.

See also, District Court cases in which quota relief has been granted: Davis v. County of Los Angeles (Los Angeles Fire Department) No. 73–63 W.P.G. (C.D.Calif. 6/7/73); Coffee v. Braddy, No. 71–44 (M.D.

point on the Civil Service list shall retain their places thereon and on any future Fireman H–2 Civil Service list constituted as hereinafter provided, subject only to the court's determination concerning whether the alternating method of appointing qualified eligibles from any future H–2 list should be terminated or continued.

(3) Meanwhile, the Commission shall continue to take steps with all reasonable diligence to comply with this court's previous orders to empirically validate its Fireman H–2 selection procedures as being truly job-related and nondiscriminatory within the meaning of Civil Rights Act of 1964, Title VI; also Guidelines on Employee Selection Procedures (Federal Register, Title 29, Chap. XIV, §§ 1607.1–1607.14; Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); and, upon a showing to that effect, to conduct its future Fireman H–2 examinations based on such validated tests.

(4) In connection with any future Fireman H–2 Civil Service examinations and as a means of reassuring and encouraging minority applicants the Commission shall take steps designed to inform all potential Fireman H–2 applicants—especially but not exclusively, potential minority applicants—concerning its application and testing procedures giving a general description of the subjects considered to be job-related, and that its examinations have been validated as above required.

(5) These provisions should serve to expedite the filling of existing and rapidly increasing Fire Department vacancies with qualified eligible applicants including at least 118 qualified minority applicants. The court, however, reserves power to make such further orders as may be found necessary to fashion further affirmative relief compatible with the facts as above found or as they may be hereinafter found.

---

Fla.1971); Arnold v. Ballard, No. C–73–478 (N.D.Ohio 5/14/73); Harper v. Baltimore (Fire Dept.) 359 F.Supp. 1187 (D.Md.1973); Commonwealth v. O'Neil (Philadelphia Police Department), 348 F.Supp. 1084 (E.D.Pa. 1972) (modified in 473 F.2d 1029 (3rd Cir. 2/8/73 en banc); NAACP v. Allen (State Police) 340 F.Supp. 703 (N.D.Ala.1912); Shield Club v. City of Cleveland, 370 F. Supp. 251 (N.D.Ohio 1972); Pennsylvania v. Sebastian, 368 F.Supp. 854 (W.D.Pa.1972).

See also, Porcelli v. Titus, 431 F.2d 1254 (3rd Cir. 1970), cert. den., 402 U.S. 944, 91 S.Ct. 1612, 29 L.Ed.2d 112 (1971), a Newark, New Jersey School faculty promotion case in which the court unanimously holds that a challenged preferential promotion program, although based on race, was designed to racially integrate the faculty and was proper. (Compare, Anderson v. S.F. School Dist., 357 F. Supp. 248 (N.D.Cal.1972); Defunis v. Odegaard, 82 Wash.2d 11, 507 P.2d 1169, 1181 (1973), a State University Law School admission case in which a white applicant claimed preferential admission had been given to minority applicants. A 6 to 2 decision, reversing trial court, holds that the challenged admission procedure was *not* arbitrary or capricious (citing Carter v. Gallagher, supra; also citing Porcelli v. Titus, supra). A dissent (507 P.2d at pp. 1197 and 1200) cites Anderson v. S.F. School District, supra. It is this case which was recently (11/20/73) accepted on certiorari by the U.S. Supreme Court (42 Law Week 3306). Compare this acceptance with the denial of certiorari in Carter v. Gallagher, supra.

See also, school teacher hiring cases, e. g., Armstead v. Starkville School District, 461 F.2d 276 (5th Cir. 1972); Baker v. Columbus, 462 F.2d 1112, 1115 (5th Cir. 1972).